# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
*ex. rel.* Louis Scutellaro,

        Plaintiff,

        v.

CAPITOL SUPPLY, INC.,

        Defendant.

Civil Action No. 10-1094 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The relator, Louis Scutellaro, brings this lawsuit against the defendant, Capitol Supply, Inc., pursuant to the *qui tam* provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(b)(1), alleging that the defendant falsely certified that the products it sold to federal agencies were manufactured in compliance with the Trade Agreements Act ("TAA"), 19 U.S.C. §§ 2501 *et seq.*, and Buy American Act ("BAA"), 41 U.S.C. §§ 8301 *et seq.*, which together require that products sold to the government come only from designated countries.[1] Rel.'s First Am. Compl. ("Rel.'s FAC") ¶¶ 10–20, ECF No. 27. The relator contends that thousands of the products sold by the defendant to the U.S. government came from non-designated countries. The United States intervened with respect to Fellowes brand document shredders, pursuant to 31 U.S.C.

---

[1] The BAA prescribes, subject to certain exceptions, that "[o]nly unmanufactured articles, materials, and supplies that have been mined or produced in the United States, and only manufactured articles, materials, and supplies that have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured in the United States, shall be acquired" by a federal agency. 41 U.S.C. § 8302(a)(1). The TAA provides that "the President may waive" the requirements of the BAA "with respect to eligible products of any foreign country or instrumentality designated under subsection (b) of this section." 19 U.S.C. § 2511(a). These "designated countries" include, *inter alia*, countries that are party to specified agreements and that "provide appropriate reciprocal competitive government procurement opportunities to United States products and suppliers of such products." *Id.* § 2511(b)(1); *see also* 48 C.F.R. § 25.003 (listing designated countries).

§ 3730(b)(4)(A). *See generally* U.S. First Am. Compl. in Partial Intervention ("U.S. FAC"), ECF No. 31.

Thus far, this litigation has spanned seven years. The relator filed his initial complaint in June 2010, *see generally* Rel.'s Compl., ECF No. 1, and the government subsequently served the defendant with two subpoenas *duces tecum*, in 2010 and 2011, to obtain country of origin ("COO") information for products sold by the defendant to federal agencies. U.S. Pet. Summ. Enf. OIG Subpoena ("U.S. Pet."), Ex. 1, Decl. of Crystal Johnson, Special Agent, OIG ("Johnson Decl.") ¶¶ 10, 12, Misc. No. 13-373 (BAH), ECF No. 1-1. The defendant, however, failed to comply fully with the subpoenas, leading this Court to grant the government's Petition for Summary Enforcement of the subpoenas. *See generally* Order Granting U.S. Pet., No. 13-mc-373-BAH, ECF No. 17; *see also generally United States v. Capitol Supply, Inc. ("Capitol Supply")*, 27 F. Supp. 3d 91 (D.D.C. 2014). When the defendant's failure to comply with the subpoenas persisted, the government moved for sanctions, and this Court entered a Conditional Order of Contempt against the defendant on August 6, 2014. *See generally* Order Granting in Part and Denying in Part U.S. Mot. Sanctions ("Civil Contempt Order"), No. 13-mc-373-BAH, ECF No. 27. Ultimately, the defendant filed a certification conceding that it had retained no COO information responsive to the subpoenas prior to July 2009 and only incomplete information thereafter. Def.'s Supp. Cert. at 1, Feb. 27, 2015, ECF No. 72-1. Discovery was then temporarily stayed for mediation, *see* Minute Order (dated Aug. 3, 2015), which proved unsuccessful.

The stay having been lifted, *see* Minute Order (dated Feb. 8, 2016), the parties have now filed a total of five motions. First, the relator and the government have each filed a motion for an adverse inference. *See generally* Relator's Mot. Adverse Inference ("Rel.'s Mot. Adv. Inf."),

ECF No. 93; U.S. Mot. Adverse Inference ("U.S. Mot. Adv. Inf."), ECF No. 95. Second, the defendant has filed a motion for summary judgment predicated on the public disclosure bar. *See* Def.'s Supp. Mot. Summ. J. ("Def.'s MSJ"), ECF No. 92. The relator and the government also have each moved for summary judgment. U.S. Mot. Summ. J. ("U.S. MSJ"), ECF No. 94; Rel.'s Mot. Summ. J. ("Rel.'s MSJ"), ECF No. 96. For the reasons set forth below, the motions for adverse inference are granted, and all three motions for summary judgment are denied.

## I.      BACKGROUND

Given the longevity of this litigation, the procedural history is described after setting out the facts pertinent to the pending motions, which facts have also been summarized in a prior opinion. *See Capitol Supply*, 27 F. Supp. 3d 91, 93–94 (D.D.C. 2014).

### A.      Factual History

#### 1.      The Defendant's Business with the Federal Government

The defendant offers for sale to the federal government nearly one million products from thousands of manufacturers under various Federal Supply Schedule contracts with the General Services Administration ("GSA") through the GSA Advantage! website. Def.'s Opp'n U.S. Pet., Ex. 1, Decl. of Robert Steinman Supp. Opp'n U.S. Pet. ("Steinman Decl.") ¶¶ 2–3, Misc. No. 13-373 (BAH), ECF No. 8-1.[2] The defendant obtained its first contract with GSA in 1985 and, by 1996, the federal government was its primary source of business. Rel.'s SMF ¶¶ 8–9. As of April 2016, the defendant held eight federal contracts, six of which are GSA contracts. *See* Def.'s Omnibus Stmt. Genuine Issues of Material Fact ("Def.'s SMF") ¶ 9, ECF No. 114. During the pendency of this litigation, the government has renewed seven of the defendant's contracts, and awarded the defendant two new contracts. *Id.* ¶ 11.

---

[2]      Robert Steinman is the President and CEO of the defendant and its predecessor Capitol Furniture Company. *See* Rel.'s Stmt. Undisputed Material Facts ("Rel.'s SMF") ¶ 4, ECF No. 96-3.

The defendant entered into one of these contracts with GSA, Multiple Award Schedule Contract No. GS-02F-0100N, U.S. MSJ, Ex.1A, MAS Contract 0100N, ECF No. 94-3, on January 6, 2003. The contract, which permits the defendant to advertise and sell certain office supplies to various federal agencies through the GSA Advantage! website, is governed by specific regulations and provisions of the Federal Acquisition Regulation ("FAR"). These regulations require, *inter alia*, that all vendors selling products to federal agencies retain records regarding the COO of each of their products. MAS Contract 0100N at 64 (incorporating 48 C.F.R. § 52.225-5); Def.'s Am. Answer ¶ 10, ECF No. 54-1; Johnson Decl. ¶ 8a. Under the FAR applicable to MAS Contract 0100N, the defendant certifies that each "end product" sold is TAA compliant. *See* MAS Contract 0100N at 84–86; Def.'s SMF ¶ 6; *see also* 48 C.F.R. § 52.225-6(a) ("The offeror certifies that each end product, except those listed in paragraph (b) of this provision, is a U.S.-made or designated country end product, as defined in the clause of this solicitation entitled 'Trade Agreements.'"); 48 C.F.R. § 52.225-5(b) ("The Contractor shall deliver under this contract only U.S.-made or designated country end products except to the extent that, in its offer, it specified delivery of other end products in the provision entitled 'Trade Agreements Certificate.'"). In its invoices, however, the defendant does not expressly certify the COO for its products, or, for that matter, compliance with the TAA. Def.'s SMF ¶¶ 19–20.

Under MAS Contract 0100N, the defendant sold a variety of office supplies, including document shredders manufactured by Fellowes, Inc. ("Fellowes"), to a number of federal agencies through the GSA Advantage! website. U.S. FAC ¶¶ 8; Def.'s Am. Answer ¶ 8. The defendant obtained the goods from several suppliers, none of which expressly certified that the Fellowes document shredders were TAA compliant. *See, e.g.*, U.S. MSJ, Ex. 6, United Stationers' Letter of Supply, ECF No. 94-9; *id.*, Ex. 8, Tech Data Terms & Conditions of Sale,

ECF No. 94-11; *id.*, Ex. 7, Ingram Micro Letter of Supply and accompanying Fellowes Letter of Supply ("Ingram Micro Letter of Supply"), ECF No. 94-10.[3]

### 2. The Defendant's Tracking of COO Data

According to the defendant, its "computer system and management of COO information has significantly evolved over time." Def.'s SMF ¶ 21. When the defendant entered the office-products business in 2003, its only supplier was United Stationers. *Id.* ¶ 23. The original price list was compiled in a spreadsheet and a "rudimentary database in Microsoft Access was developed." *Id.* ¶ 24. United Stationers provided the defendant with COO data "approximately four times per year," and, accordingly, the defendant manually updated its COO information on a quarterly basis in the Microsoft Access database. *Id.* ¶¶ 25, 29.

Sometime in 2005 or 2006, over the course of more than one year, the defendant migrated its COO files from Microsoft Access to a more automated system housed on an "SQL Server." *Id.* ¶ 30. In order to track the COO of products offered for sale, suppliers transmitted the COO "data feeds" to the SQL server directly. Rel.'s MSJ, Ex. 4, Dep. of Stuart Fox ("Fox Dep.") at 38–40, ECF No. 96-8.[4] The vendors had different "update schedules," and some information was updated "daily, some weekly, some monthly, some quarterly, and some only when [the vendor] sent [the defendant] new pricing." Def.'s SMF ¶ 31. According to the defendant, if a product was TAA non-compliant, the system was designed to prevent that product from being either advertised or sold through the GSA Advantage! website. Fox Dep. at 141:14–

---

[3]     For example, United Stationers explained that it was a "wholesale distributor" and "does not manufacture the products it sells," and thus, while it "asks each of its suppliers to verify the Country of Origin Information," it "cannot independently verify the Country of Origin information provided by its suppliers and accordingly does not warrant its accuracy." United Stationers' Letter of Supply, Attachment A. Ingram Micro also made no independent promise that its products were TAA compliant, indicating only that Fellowes products may be compliant if ordered from the Fellowes' GSA Product/Pricelist, which was periodically updated by Fellowes. *See* Ingram Micro Letter of Supply.
[4]     Stuart Fox's firm was hired by the defendant to assist with IT matters. *See id.* at 18:3–19:11.

142:5; *see also* Def.'s SMF ¶ 33 ("When non-compliant COO information was detected (whether from a manufacture [sic], vendor, or the GSA itself), Capitol would seek a contract modification to have the product removed from the schedule and the GSA website."). The defendant later asserts, however, that under this system, "even though a product with non-compliant COO information may be listed for sale on the GSA website, if/when the product is ordered through the GSA website, Capitol's internal system will not process the sale because such products are identified as unavailable." Def.'s SMF ¶ 37. Given the differing descriptions of the defendant's handling of non-compliant products, the record is unclear whether the company's system actually prevents non-compliant products from being listed for sale on the GSA Advantage! website or from being sold.

Before June or July 2009, the historical COO data for the products offered for sale by the defendant under its GSA contracts was not retained in the system. Def.'s Supp. Cert. at 1; *see also* Steinman Decl. ¶ 6. Instead, it was overwritten as new data came in from each of the defendant's suppliers. Def.'s Supp. Cert. at 1; *see also* Steinman Decl. ¶ 6; Fox Dep. at 51–55. From July 2009 to November 2010, the defendant transitioned to a new system whereby COO information was "tracked by vendor and a history of what a vendor indicated was the COO was preserved on each update." Def.'s SMF ¶ 35. Although the defendant explains that this transition was prompted because it learned that suppliers often had "conflicting COO information," *id.* ¶ 34, the defendant's IT contractor, Stuart Fox, testified that the defendant began retaining COO information in response to the September 2010 subpoena "just to be safe," Fox Dep. at 53:13–55:20.[5] Thereafter, in December 2010, the defendant created a "country of

---

[5]     Under questioning by the relator's counsel, Mr. Fox later testified that he was not "100 percent sure that it was the subpoenas that triggered" the tracking of COO information because some COO information was retained before the 2010 subpoena "[s]o, there might be some other event that happened." Fox Dep. at 56:4–9.

origin history table" that preserved COO information from the "data feeds" received from its suppliers. *Id*. at 69:17–72:16; *see also* Steinman Decl. ¶ 6. The defendant does not explain why it waited until 2009 to retain COO data when GSA began notifying the defendant about issues with the company listing non-compliant products on the GSA Advantage! website as early as 2005. *See infra* Part I.A.4.

### 3. GSA Contractor Assistance Visits

Pursuant to the defendant's contracts, Industrial Operations Analysts ("IOAs") from the GSA conduct regularly scheduled "Contractor Assistance Visits" ("CAVs"). Def.'s SMF ¶ 42. According to the GSA, "a CAV serves several purposes: to clarify the terms and conditions of the subject contract; to assist with contractor questions and concerns; to identify potential problems; to gather contractor performance data; and to verify processes including the contractor's sales tracking system, trade agreements, and other key contract requirements." *Id*. ¶ 44 (citing *id*., Ex. 3, GSA's New Contractor Orientation PowerPoint dated August 2012 ("GSA PowerPoint") at 11, ECF No. 114-3). Following a CAV, a "Report Card" is issued to the contractor based on observations made during the visit. *See* GSA PowerPoint at 13. The GSA explains that a Report Card is a "'snap-shot' in time of [the contractor's] Multiple Award Schedule contract after a [CAV]" and "deals directly with performance against some of the main MAS Terms and Conditions." *Id*. at 14.

Tom Brady, the GSA Director of the Supply Management Division, testified that "[i]n part, the CAV visit evaluates record retention practices." Dep. of Tom Brady ("Brady Dep.") at 72:12–14, ECF No. 102. Mr. Brady stated that "maintenance of COO information [is] a key contract requirement." *Id*. at 73:20–22. IOAs who conducted CAVs of the defendant were advised that the defendant did not retain historical COO information for every product, at least

until approximately 2009 or 2010. Def.'s SMF ¶ 57. For every Report Card in the record, ranging in date from 2007 through 2014, one IOA, Wendy Springer, who worked in the Atlanta Regional Office, was the "assigned IOA." *See generally* Def.'s Opp'n U.S. & Rel.'s MSJs, Composite Ex. 2, GSA Report Cards, ECF No. 113-2; *see also* Dep. of Wendy Springer, Vol. I ("Springer Dep. I") at 6:12, ECF No. 103.[6] Ms. Springer, who never gave the defendant a critical mark for its COO tracking, testified that she "didn't see anything wrong with their process or their understanding of the Trade Agreements Act." Springer Dep. I at 67:2–6. Ms. Springer also testified that she could not recall having informed the defendant "that it would be violating any law by failing to retain contemporaneous COO records." *Id.* at 106:1–12. Further, in one of her CAV reports, dated September 26, 2007, Ms. Springer stated that the defendant "demonstrate[d] compliance with the Trade Agreements Act" and "maintains a database of all products with a listing of country of origin to ensure all products offered are TAA compliant." Def.'s SMF, Ex. 4, CAV Report dated Sept. 26, 2007 at 1–2, ECF No. 114-4. The IOAs' review of documentation and processes was, however, limited. Ms. Springer explained that the defendant controlled the scope of the CAVs by selecting three small samples of data, such as "a letter of supply or just any document that shows that they have some sort of documents that are source documents," that Ms. Springer would review. Springer Dep. I at 58:8–60:2.

### 4.    GSA Notices of TAA Violations

While the IOAs in the Regional Office were issuing the defendant favorable reviews, back at the GSA's New York City offices, Michelle Williams, the GSA Trade Agreements Act and GSA Advantage! Coordinator, was regularly notifying the defendant via email that certain TAA non-compliant products were being offered for sale by the defendant on the GSA

---

[6]      For report cards in the record prior to January 2010, the visit was conducted by Christopher George, though Ms. Springer was still the assigned IOA for those report cards. *See id.* at 1–30.

Advantage! website. *See, e.g.*, U.S. MSJ, Ex. 4A at 1, ECF No. 94-7. On September 21, 2005, for example, Ms. Williams informed the defendant that over 400 Chinese-made goods were being offered for sale by the defendant on the website, in breach of the TAA and MAS Contract 0100N. *Id.*, Ex. 4A at 1–10. China is not included on the list of designated countries under the TAA. *See* 48 C.F.R. § 25.003 (listing designated countries). Among the 400 products were 45 office products manufactured by Fellowes, including document shredders. *See* U.S. MSJ, Ex. 4A at 1–10. Mr. Steinman acknowledged the email and pledged to remove the defendant's TAA non-compliant products from the GSA Advantage! website within two weeks. *See generally* Rel.'s MSJ, Ex. 16, ECF No. 96-20.

Later the same month, however, on September 29, 2005, Ms. Williams again notified the defendant that the U.S. Army had complained that hundreds of Chinese-made products were offered for sale by the defendant on the GSA Advantage! website, as well as a Department of Defense website. *See* U.S. MSJ, Ex. 4B, ECF No. 94-7. Among these products were twenty-one office products made by Fellowes, including document shredders. *See id.* at 1–6. Ms. Williams sent at least fifteen additional notices of possible TAA violations between 2006 and 2012 on the following dates: April 21, 2006; August 22, 2006; November 5, 2007; March 16, 2009; April 13, 2009; July 2, 2009; August 24, 2009; October 15, 2009; August 3, 2010; November 15, 2010; April 11, 2011; April 19, 2011; January 9, 2012; June 8, 2012; and February 13, 2012. *Id.*, Exs. 4C–4Q, ECF No. 94-7.

In an April 2006 notice, Ms. Williams informed the defendant that it needed to "conduct a self-assessment of the current processes, procedures and/or systems . . . in place to monitor the country of origin for all products offered under [its] Schedule contract." *Id.*, Ex. 4C; *see also id.*, Ex. 4D–4Q. Further, Ms. Williams stressed that "compliance with the Trade Agreements Act is

a serious issue" and warned the defendant that the Department of Justice "has been proactive in conducting investigations, and a number of settlements have already been reached under the *qui tam* provision of the False Claims Act." *Id.*, Ex. 4C at 1–2.

Despite over a dozen notices during a six year period, the defendant continued to offer TAA non-compliant products for sale on the GSA Advantage! website. Consequently, on September 14, 2011, the defendant received a "Cure Notification Letter" from Edward Lew, a Senior Contracting Officer with GSA Federal Acquisition Services, due to the defendant's "continued contract violations," citing in particular "non-TAA items listed on [the defendant's] schedule." *Id.*, Ex. 5, Cure Notification Letter ¶ 4, ECF No. 94-8. The letter informed the defendant that until the violations were rectified, it would not be permitted to offer any products for sale on the GSA Advantage! website. On September 22, 2011, however, Mr. Lew informed the defendant that the GSA had determined that the defendant's cure plan "met the necessary requirements set forth in the cure letter." *Id.*, Ex. 10 at 2, ECF No. 94-13. The record is unclear what the defendant included in the "cure plan" to show that "necessary requirements" were met. Mr. Lew expected that the GSA Advantage! website and the DOD website would "be fully operational" for the defendant "some time [the next day]." *Id.* The defendant, however, was apparently dissatisfied with this result, as it responded to Mr. Lew's notification by declaring that "GSA should make best efforts to restore [the defendant] to all purchasing channels" that same day "to mitigate the harm the GSA ha[d] arbitrarily, capriciously and needlessly imposed on Capitol Supply." *Id.* at 1. Moreover, one of the defendant's attorneys notified Mr. Lew that she was sharing Mr. Lew's notification with the defendant's lobbying firm, which would "in turn, share [Mr. Lew's] response with Members of Congress including those who have appropriations authority over" the GSA. *Id.* Later that day, the defendant's lobbyist wrote to Mr. Lew that

"Congressional oversight [was] now reviewing [GSA's] progress and contracting methodology."
*Id.*, Ex. 11 at 1, ECF No. 94-14.

### 5.    The Relator's and the Government's Damages Analyses

The damages calculations performed by the relator's and the government's experts are not the most accessible, in part because the plaintiffs had to cull sales and COO data from disparate sources given the defendant's deficient recordkeeping procedures for many years. The relator retained Dr. Dwight Steward, an economist and statistician, to calculate damages based on sales and COO data. *See* Rel.'s SMF ¶ 114. In performing his calculations, Dr. Steward relied upon sales and COO data supplied by the GSA, the defendant, and the defendant's suppliers.[7] *Id.* ¶¶ 117, 130, 139, 150.

Dr. Steward's damages calculation proceeded in four stages. *See* Decl. of Dr. Steward, PhD ("Steward Decl.") ¶ 3, ECF No. 96-52 ("I was asked to break down the analysis into four stages based on the information used in each stage."). In the first stage, Dr. Steward relied on sales and COO data provided by suppliers as well as sales data provided by the defendant. *Id.* ¶ 4. In stages two and three, Dr. Steward relied upon GSA sales data and COO data provided by the defendant. *Id.* ¶¶ 13, 20. Stage four utilized GSA sales data supplied by the defendant and COO data provided by the defendant's vendors. *Id.* ¶ 29. Dr. Steward performed an "overlap analysis" to ensure that "sales of products were not double-counted by being included in multiple stages of the calculations." *Id.* ¶ 38. "The total number and value of the TAA non-compliant

---

[7]    In 2014 and 2015, both the relator and the government issued subpoenas to the defendant's suppliers to gather information, including COO data. The relator sent nine subpoenas to the defendant's suppliers: Cisco, D&H Distributing, Hewlett Packard, Ingram Micro, SP Richards, Tech Data, Trimega Purchasing Association, Synnex, and United Stationers. Def.'s MSJ, Ex. 6, Rel.'s Supp. Resps. Def.'s First Interrogatories, at 8, ECF No. 92-6.

sales for all four stages were calculated by adding the totals for all four stages and subtracting the overlaps." *Id.* ¶ 40.

Dr. Steward's report contains "four possible single damages amounts" depending on how the calculations were performed, *id.* ¶ 41:

1. 21,860 TAA non-compliant sales worth $4,223,734.00

2. 24,245 TAA non-compliant sales worth $4,788,156.06

3. 22,471 TAA non-compliant sales worth $4,271,335.00

4. 24,808 TAA non-compliant sales worth $4,834,716.06

Dr. Steward suggests that his stage one damages calculation is probably "most accurate" because the underlying data was obtained via subpoenas to the defendant's suppliers, and the subpoenas "limit themselves to GSA sales," and because the defendant's own sales files "regularly did not include original manufacturer identification numbers needed to match [the defendant's] sales files to vendor supplied COO files." *Id.* ¶ 5.

For its part, the government retained Richard P. Kozlow, an accountant, auditor, risk management professional, and consultant on financial and operational control. U.S. MSJ, Ex. 12, Richard P. Kozlow Expert Report ("Kozlow Rep.") ¶ 1, ECF No. 94-15. Mr. Kozlow relied on sales data provided by the defendant and COO information provided by the defendant, Fellowes, and the defendant's suppliers (United Stationers and Ingram Micro). *Id.* ¶ 4. In performing his calculations, Mr. Kozlow "followed the relevant elements of" the International Standards for the Professional Practice of Internal Auditing and Generally Accepted Audit Standards. *Id.* Mr. Kozlow opines that, from December 24, 2003, through December 5, 2011, the defendant sold to the government 827 Fellowes shredders worth $579,919.65. *Id.* ¶ 7. Of these sales, Mr. Kozlow concluded that 588 (or 71.1%) of those shredders, worth $183,709.92

(or 31.7%) were manufactured in China. *Id.* Mr. Kozlow reported that he was unable to determine the COO of 65 Fellowes shredder sales, totaling $62,824.51, because "Capitol Supply failed to include accurate information on model numbers that could be related back to Fellowes, Inc. product listings." *Id.* ¶ 9.

Mr. Kozlow revised his initial report because he had originally duplicated 81 items. Dep. of Richard P. Kozlow at 52:4–16, ECF No. 110. Further, Mr. Kozlow explained that his analysis for identifying COO information "was not an exact science" because "[t]he vendor line items file had a variety of different descriptions for the same product. . . . It was also not consistent in listing model numbers. Sometimes model numbers were included in the description line; sometimes they were not. Sometimes model numbers showed in the model number column; very often they did not." *Id.* at 66:8–67:1.

Since the government seeks treble damages, the government concludes that the gross total for damages under the FCA, for just the Fellowes document shredders, is $551,129.76. U.S. MSJ at 14. The government assumes "that the value of the Chinese-made shredders was the price paid by the United States in each transaction" and, thus, $183,709.92 may be subtracted from the trebled damages, resulting in a total damages award of $367,419.84. *Id.* The government also asks for an award of "civil penalties in the amount of $10,000 for each false claim or certification, totaling $5.88 million." *Id.*

The defendant takes issue with Dr. Steward's and Mr. Kozlow's damages analyses. *See* Def.'s SMF ¶¶ 110, 113–57; Def.'s Opp'n U.S. & Rel.'s MSJs at 13–24.

### B.    Procedural History

#### 1.    Relator's Complaint

The relator's original complaint, filed on behalf of the United States against the defendant, pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b), alleges that the defendant was "selling products to the United States Government that did not originate in designated countries under the Trade Agreements Act, and therefore . . . present[ed] false claims to the United States Government for payment," Rel.'s Compl. ¶ 5, ECF No. 1. Specifically, the complaint alleges that the defendant "falsely claimed that Fellowes Manufacturing Company's paper shredders," which were offered for sale through Capitol's Federal Supply Schedule contracts, "were made in the United States, whereas, in truth and in fact, they were manufactured in China." *Id.* ¶ 16. The complaint also alleges that the defendant "falsely market[s] numerous other products . . . as being manufactured in the United States when they are not, including, but not limited to: light bulbs (incandescent, fluorescent, halogen, sodium, etc.), light fixtures (indoor and outdoor), thermostats, televisions, computer monitors, computer back up power supplies, electric heaters, exhaust fans, batteries, ballasts for fluorescent fixtures, vacuum cleaners, clocks and timers. Most, if not all, of the products are made in China or Mexico." *Id.* ¶ 20.

#### 2.    The Government's Investigation and Intervention

After receiving the relator's *qui tam* complaint, the GSA's Office of Inspector General ("OIG") initiated an investigation into the alleged FCA violations. *See* Johnson Decl. ¶ 9. On November 4, 2010, OIG "served the first of two subpoenas duces tecum upon Capitol Supply requesting all product, sales and country of origin information for Fellowes brand shredders sold pursuant to all GSA schedule contracts from January 2004 through the date of the subpoena."

*See* U.S. Pet. ¶ 5(a), Misc. No. 13-373 (BAH), ECF No. 1.[8] A second subpoena was issued in June 2011 "requesting all information on Multiple Award Schedule Contract No. GS-02F-0100N, including all sales and country of origin information for all products sold during the period of January 1, 2004 through the date of the subpoena." *Id.* ¶ 5(b). The government intervened only with respect to Fellowes document shredders, allegedly made in China. U.S. FAC ¶¶ 11–12.

Meanwhile, unsatisfied with the defendant's document production in response to the two subpoenas, the government filed a Petition for Summary Enforcement of Inspector General Subpoena on April 16, 2013, which was granted and the defendant directed to comply with the subpoenas. *See generally* Order Granting U.S. Pet., Misc. No. 13-373 (BAH), ECF No. 17; *see also generally Capitol Supply*, 27 F. Supp. 3d 91 (rejecting the defendant's argument that further compliance with the subpoenas would be unreasonable because (1) the defendant had already produced voluminous documents and further production would be an undue burden; (2) the defendant had produced documents in the format in which the documents are received and had no obligation to convert records into any other format requested by the OIG; and (3) the defendant had no obligation to produce records already in the government's possession). Notwithstanding the Court's pellucid instruction, the defendant continued to drag its feet in producing the information sought in the subpoenas, prompting the government to move for sanctions in July 2014. *See generally* Pet.'s Mot. Sanctions, Misc. No. 13-373 (BAH), ECF No. 20. After another hearing, the Court entered a Conditional Order of Contempt against the defendant on August 6, 2014, giving the defendant until September 2, 2014, to comply with the Court's previous Order. *See* Civil Contempt Order.

---

[8] The GSA OIG is empowered to issue subpoenas in connection with investigations of fraud and abuse in GSA programs pursuant to the Inspector General Act of 1978, 5 U.S.C. § 6(a)(4).

The defendant filed a Notice of Compliance with Court Orders on September 2, 2014, certifying that it had "produced to the Plaintiffs via e-mail credentials to a FTP site containing the documents being produced." Def.'s Notice of Compliance with Court Order at 1, Misc. No. 13-373 (BAH), ECF No. 28. Six months later, the defendant filed a Supplemental Certification in the instant case, which finally disclosed that "Capitol does not have any information on the Country of Origin for any sale prior to June 2009. From July 2009 through November 2010, Capitol's information in its computer database on the Country of Origin for sales are incomplete. From December 2010 through the present day, Capitol's computer database has the majority of information it received from manufacturer or vendor Country of Origin data feeds." Def.'s Supp. Cert. at 1. Furthermore, the Supplemental Certification indicated that "Capitol does not have any e-mail correspondence prior to the approximate date of July, 2011." *Id.*

### 3. The Defendant's Motion to Dismiss

Following the government's intervention, the defendant filed motions to dismiss the relator's First Amended Complaint and the government's Complaint in Partial Intervention. *See* Def.'s Mot. Dismiss Rel.'s FAC, ECF No. 35; Def.'s Mot. Dismiss U.S. FAC, ECF No. 36. On March 18, 2014, this Court held a motions hearing and granted the defendant's motion "with respect to [the relator's] claims that are identical to those raised in the" government's First Amended Complaint, but denied the motion in all other respects. Minute Entry (dated March 18, 2014). Further, the Court dismissed the common law claims raised in the government's First Amended Complaint under Counts III and IV, leaving only the FCA claims under Counts I and II. *Id.*; *see also* U.S. FAC ¶¶ 15–26.

### 4. The Parties' Ensuing Discovery

Thereafter, the parties engaged in additional discovery, calling upon the Court to rule on various discovery-related issues, *see, e.g.*, Minute Order (dated May 28, 2015) (denying as moot the defendant's Motion to Compel Responsive Documents, and granting the relator leave to take an additional Rule 30(b)(6) deposition); Minute Order (dated July 22, 2015) (scheduling a telephonic hearing to address a discovery dispute), and to allow an extension of time for completing discovery, *see* Minute Order (dated June 1, 2015). On August 3, 2015, the Court granted the parties' Joint Motion to Stay Discovery and Refer the Matter for Mediation and stayed this action pending mediation. *See* Minute Order (dated Aug. 3, 2015). When mediation proved unsuccessful, the Court lifted the stay and the parties were granted yet another extension of time for completing discovery. *See* Minute Order (dated Feb. 8, 2016).

The parties' respective motions for summary judgment are now ripe for review. Also pending before the Court are two motions for adverse inference, one by the relator and one by the government.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc. ("Liberty Lobby")*, 477 U.S. 242, 256 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on

summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party" (internal quotation marks omitted)); *see also* FED. R. CIV. P. 56(c), (e)(2)–(3). When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the non-moving party, with the court determining, for each side, whether the Rule 56 standard has been met. *See McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982) ("The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion.") (citing 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (1973)); *see also Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1213 (10th Cir. 2016) ("Where, as here, we are presented with cross-motions for summary judgment, we must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." (internal quotation marks omitted)); *Pac. Indem. Co. v. Deming*, 828 F.3d 19, 23 (1st Cir. 2016) (same).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby*, 477 U.S. at 255 (alteration in original)). Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (quoting *Liberty Lobby*, 477 U.S. at 255); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295–96 (D.C. Cir. 2015). In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *Equal Rights Ctr. v. Post Props, Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court is required to consider only the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

## III.   DISCUSSION

Two of the five pending motions ask this Court to draw an adverse inference from the defendant's failure to keep historical COO information from 2003 through 2010, and the remaining three motions are cross-motions for summary judgment. The two motions for adverse inference are addressed first, before turning to the cross-motions for summary judgment.

### A.   Motions for Adverse Inference

The relator and the government contend that this Court should draw an adverse inference because the defendant failed to preserve case-dispositive COO evidence for the products it sold on the GSA Advantage! website, in contravention of applicable regulations, *see* 48 C.F.R.

§§ 552.215-70, 71,[9] and the defendant's contract with the GSA. *See* Rel.'s Mem. Supp. Mot. Adv. Inf. at 2–3, ECF No. 93-1 ("Put simply, the Regulations required Capitol to retain its country of origin records. . . . Capitol was [also] required to retain all contract documents pursuant to the examination of records clause. Capitol flouted its clear obligation to preserve the COO data [by, *inter alia*,] actively overwr[iting] the information after only a fleeting preservation period."); U.S. Mem. Supp. Mot. Adv. Inf, at 6, ECF No. 95 (same); *see also Capitol Supply*, 27 F. Supp. 3d at 103 ("By choosing to be part of the federal contracting program, [the defendant] assumed the burden of maintaining country of origin status documentation for all of their products."). The relator and the government urge the Court to exercise its inherent power to draw the adverse inference that, for all products for which COO is unknown because the defendant failed to retain that information, the COO is non-designated. To be precise, the relator seeks an adverse inference with respect to "250,197 transactions represent[ing] $223,378,917.40 in sales to the Federal government, or 75.4% of Capitol's sales under its GSA contracts." Rel.'s Mem. Supp. Mot. Adv. Inf. at 5. The government requests an adverse inference as to "$62,824.51 worth of Fellowes document shredders sold by Capitol Supply to Federal agencies." U.S. Mem. Supp. Mot. Adv. Inf. at 12.

The defendant does not dispute that all of its COO data for products sold prior to July 2009, and some of this data for products sold thereafter, has been overwritten or is otherwise not available from the defendant. Instead, the defendant argues that this Court's power to impose

---

[9]      In particular, applicable regulations require that any "Contractor agrees that the Administrator of General Services or any duly authorized representatives shall, until the expiration of 3 years after final payment under [a] contract, or of the time periods for the particular records specified in Subpart 4.7 of the Federal Acquisition Regulation (48 CFR 4.7), whichever expires earlier, have access to . . . records of the Contractor involving transactions related to this contract *or compliance with any clauses thereunder.*" 48 C.F.R. § 552.215-70 (emphasis added). As this Court has already held, "[the defendant's] admitted over-writing of information required to be retained under its contractual obligations with the government is not so easily excused. Rather, [the defendant] will have to bear the consequences of failing to fulfill these obligations." *Capitol Supply*, 27 F. Supp. 3d at 103.

sanctions predicated on spoliation of electronically stored information derives solely from Federal Rule of Civil Procedure 37(e)—*i.e.*, the Court has no authority to act pursuant to its inherent powers—and the relator and the government have not met the rigors of the newly amended Rule 37(e). *See* Def.'s Opp'n U.S. & Rel.'s Mots. Adv. Inf. at 2, ECF No. 112 ("Rule 37(e) is applicable to and governs this case, and before an adverse inference instruction is given, Plaintiffs must satisfy the heightened burden associated with obtaining an adverse inference ruling under Rule 37(e)."); *see also id.* at 15–30. Thus, the threshold question is whether Rule 37(e) "is applicable to and governs this case," as the defendant contends.[10]

Rule 37(e) applies when "electronically stored information [] should have been preserved in the anticipation or conduct of litigation." The commentary to the amended Rule emphasizes this point, explaining that "[t]he new rule applies only if the lost information should have been preserved in the anticipation or conduct of litigation and the party failed to take reasonable steps to preserve it." FED. R. CIV. P. 37(e) 2015 advisory committee's note. The commentary further notes that "Rule 37(e) is based on th[e] common-law duty" to "preserve relevant information when litigation is reasonably foreseeable." *Id.* Especially relevant is the commentary's explicit statement that courts should be cognizant of any "independent requirement that the lost information be preserved," which requirement may "arise from many sources," including, *inter*

---

[10] Rule 37(e), as amended, provides:

    **(e) Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

        **(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

        **(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

            **(A)** presume that the lost information was unfavorable to the party;

            **(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or

            **(C)** dismiss the action or enter a default judgment.

*alia*, "administrative regulations." *Id.* Here, the plaintiffs do not claim that the missing COO information was spoliated "in the anticipation or conduct of litigation," but rather that the spoliation was in violation of the defendant's regulatory and contractual obligations.[11] *See, e.g.*, Rel.'s Reply Supp. Mot. Adv. Inf. at 3, ECF No. 125. Accordingly, by its express terms, Rule 37(e) does not govern the instant spoliation motions, and the Court must decide whether an adverse inference is proper pursuant to its inherent authority. *See, e.g.*, *DVComm, LLC v. Hotwire Commc'ns, LLC*, No. CV 14-5543, 2016 WL 6246824, at *7 (E.D. Pa. Feb. 3, 2016) ("Without limitation, litigation misconduct may also be otherwise sanctioned by the inherent power of the court. This court is vested with broad discretion to fashion an appropriate sanction pursuant to its inherent powers to sanction and redress litigation abuse. . . . As we find substantial evidence DVComm destroyed ESI under Rule 37(e)(2), we do not examine our ability to impose additional non-monetary sanctions under our inherent power."); *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497 (S.D.N.Y. 2016) ("If . . . Rule 37(e) were construed not to apply to the facts here, I could nevertheless exercise inherent authority to remedy spoliation under the circumstances presented."). As the Supreme Court recently made clear, "[f]ederal courts possess certain 'inherent powers,' not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases," which "authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, ___ S. Ct. ___, 2017 WL 1377379, *5 (Apr. 18, 2017) (internal quotation marks and citations omitted).

---

[11] At some point between the contract's inception and 2010, the defendant was likely on notice that litigation was possible, given repeated communications from GSA indicating that some of the products the defendant had listed on the GSA Advantage! website failed to comply with the TAA and the BAA and that False Claims Act settlements had been reached with other similar offenders. The main thrust of the plaintiffs' adverse inference motions, however, is not that records were destroyed in anticipation of litigation but rather in violation of regulatory and contractual obligations.

The D.C. Circuit's opinion in *Talavera v. Shah*, 638 F.3d 303 (D.C. Cir. 2011), is instructive. In that case, the plaintiff brought various Title VII claims, alleging gender discrimination and retaliation, against her former employer, the United States Agency for International Development ("USAID"). *See id.* at 306. The agency defended against the plaintiff's non-promotion claim by arguing that the male selectee performed better during his interview than the plaintiff. *See id.* at 308–09. Although the interviews occurred in June 2004 and Office of Personnel Management ("OPM") regulations required preservation of promotion materials to be preserved for two years, and Equal Employment Opportunity Commission ("EEOC") regulations required retention for one year, the interviewer destroyed his interview notes in August or September 2004, approximately two months after the interviews had occurred. *Id.* at 307. The district court concluded that, "in the absence of evidence of bad faith, [the plaintiff] was entitled to only a 'weak adverse inference' relating to the destruction of the notes because the destruction was 'at worst negligent' and not intentional." *Id.* at 311. The D.C. Circuit rejected this reasoning and held that based on all the evidence, including the interviewer's failure to preserve his interview notes, in violation of applicable regulations, a jury could have concluded that USAID's rationale for the plaintiff's non-promotion was pretextual. *Id.* at 313; *accord Lattimore v. Citibank Fed. Savs. Bank*, 151 F.3d 712, 716 (7th Cir. 1998) ("The violation of a record[-]retention regulation creates a presumption that the missing record contained evidence adverse to the violator." (citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1418–19 (10th Cir. 1987); *Favors v. Fisher*, 13 F.3d 1235, 1239 (8th Cir. 1994))); *Lab. Corp. of Am. v. United States*, 108 Fed. Cl. 549, 557–60 (Fed. Cl. 2012) (imposing sanctions pursuant to the Court's inherent authority in part because applicable regulations required the GSA to retain certain procurement documentation that the GSA had failed to preserve). In so holding, the

23

Court noted three key factors: (1) the interviewer had admitted that his destruction of his notes "was not accidental," (2) the plaintiff "is a member of the classes sought to be protected" by the relevant OPM and EEOC regulations, and (3) "[t]he destroyed records were relevant to [the plaintiff's] challenge" and, indeed, "represented [the plaintiff's] best chance to present direct evidence that [the interviewer's] proffered reason for the selection was pretextual." *Id.* at 312.

Likewise here, the defendant does not argue that COO information was overwritten unknowingly or accidentally.[12] This was simply the defendant's practice for many years, notwithstanding its clear regulatory and contractual obligations to retain such information for specified periods. Also as in *Talavera*, the plaintiffs here—the U.S. government, and the relator, standing in the shoes of the government—are plainly within the "classes sought to be protected" by the regulations, which are intended to allow the government to track COO information to ensure compliance with applicable laws. Finally, there is no question that the spoliated COO information would constitute direct proof or disproof of the falsity of claims made to the government. Accordingly, as in *Talavera*, the relator and the government here are entitled to an adverse inference that the unavailable COO information would show that the relevant products came from non-designated countries, and their motions are granted. The particular form that the adverse inference will take at trial must be addressed in forthcoming pre-trial motions *in limine*. *See* Def.'s Opp'n Mots. Adv. Inf. at 30–32 & n.8 (quoting a jury instruction in another case and

---

[12] The defendant appears to argue that the Court should reverse its earlier holding that the defendant had flouted its recordkeeping obligation to retain COO information because "it did not have the benefit of certain evidence[,] namely the testimony of GSA employees[,] the *New Contractor Orientation* PowerPoint drafted and distributed by GSA[,] . . . [and] the CAV Reports or resulting Report Cards, where Ms. Springer and other IOAs from the GSA expressly reviewed and approved of Capitol's COO database and records retention." *See* Def.'s Opp'n Mots. Adv. Inf. at 20. While GSA appears to have given mixed signals to the defendant about its record management practices, none of that cited evidence is sufficient to overcome the plain language in the defendant's contract with the government, on which the Court's earlier ruling was predicated. Moreover, as the relator explains, "IOA visits and CAV report cards were very limited in nature, and by no means a full audit or endorsement of Capitol's systems." Rel.'s Reply Supp. Mot. Adv. Inf. at 11; *see also id.* at 11–12 (citing deposition testimony that IOA visits are only day-long reviews and entail a "small data sampling").

arguing that any adverse inference in this case "is not irrebutable [sic], and does not have to be adopted").

### B.    The Defendant's Motion for Summary Judgment

Also pending before the Court are the parties' cross-motions for summary judgment. The defendant's motion for summary judgment, which contends that the relator's claims must be dismissed pursuant to the FCA's public disclosure bar, is addressed before turning to the relator's and the government's motions.[13]

"The FCA encourages insiders to expose fraudulent conduct, but does not reward relators who seek to profit by bringing suits to complain of fraud that has already been publicly disclosed." *U.S. ex rel. Oliver v. Philip Morris USA Inc. ("Oliver I")*, 763 F.3d 36, 39 (D.C. Cir. 2014); *see also United States ex rel. Springfield Terminal Ry. Co. v. Quinn ("Springfield Terminal")*, 14 F.3d 645, 651 (D.C. Cir. 1994) ("The history of the FCA *qui tam* provisions demonstrates repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior."). To that end, the FCA contains a public disclosure bar, codified at 31 U.S.C. § 3730(e)(4)(A), that "limits the ability of a private party to

---

[13]    The government objects to the defendant's Statement of Genuine Issues of Material Facts because, in part, the defendant "failed to admit or dispute the facts alleged by the United States in its Statement of Material Facts not in Genuine Dispute." U.S. Resp. Def.'s SMF at 2, ECF No. 120. Both Federal Rule of Civil Procedure 56(e)(2) and Local Civil Rule 7(h) permit a district court to assume as undisputed any facts, which are identified by the moving party in its statement of material facts but are not properly addressed or controverted by the opposing party. *See* FED. R. CIV. P. 56(e)(2) (providing that "[i]f a party . . . fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion [for summary judgment]"); LCvR 7(h)(1) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."); *see also Grimes v. District of Columbia*, 794 F.3d 83, 96 (D.C. Cir. 2015) (noting that the 2010 amendment to Rule 56 "reflects the 'deemed admitted' provisions in many local rules" (quoting FED. R. CIV. P. 56 advisory committee's note (2010)). The D.C. Circuit "has long upheld strict compliance with the district court's local rules on summary judgment when invoked by the district court," *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002), recognizing that such compliance "is justified both by the nature of summary judgment and by the rule's purposes," which include "isolat[ing] the facts that the parties assert are material, distinguish[ing] disputed from undisputed facts, and identif[ying] the pertinent parts of the record," *Gardels v. CIA*, 637 F.2d 770, 773–74 (D.C. Cir. 1980). In adherence to this Rule, the Court deems as admitted any fact not plainly controverted by the defendant.

bring a *qui tam* suit where the fraud is already publicly known," *Oliver I*, 763 F.3d at 39, unless the claims are brought by the Attorney General or an "original source" of the information underlying the claims. Thus, "[t]he FCA sets up a two-part test for determining jurisdiction." *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 681 (D.C. Cir. 1997), *abrogated on other grounds by Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007). First, the court must determine whether the information underlying the allegations and transactions has been publicly disclosed. *Springfield Terminal*, 14 F.3d at 651. "If—and only if—the answer to the first question is affirmative, will the court then proceed to the original source inquiry." *Id.* (internal quotation marks and citation omitted).

Section 3730(e)(4)(A) was amended, effective March 23, 2010, as part of the Patient Protection and Affordable Care Act, *see* Patient Protection and Affordable Care Act, Pub. L. No. 111–148, § 10104(j)(2), 124 Stat. 119, 901–02 (2010). Accordingly, the threshold issue is whether the current or previous version of § 3730(e)(4)(A) applies. The pre-amendment version of § 3730(e)(4)(A), enacted in 1986, provided:

> *No court shall have jurisdiction* over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information. (emphasis added)

31 U.S.C. § 3730(e)(4)(A) (1986). Section 3730(e)(4)(A), as amended, currently provides:

> The court *shall dismiss* an action or claim under this section, *unless opposed by the Government*, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> >
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

26

> (iii)  from the news media,

> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.  (emphasis added)

31 U.S.C. § 3730(e)(4)(A) (2010).

As a textual comparison reveals, the 2010 amendment worked two interrelated changes to the public disclosure bar. First, while the pre-2010 public disclosure bar was jurisdictional by its express terms, the 2010 amendment omits the jurisdictional language and states only that a court must "dismiss" a case falling under the public disclosure bar. "Thus, when the amended version of § 3730(e)(4)(A) applies, public disclosure does not deprive the Court of subject matter jurisdiction, but merely deprives the plaintiff of his claim." *United States ex rel. Shea v. Verizon Commc'ns, Inc. ("Shea")*, 160 F. Supp. 3d 16, 24 (D.D.C. 2015).  Second, the amendments afforded the government veto power over dismissal of an FCA suit on public disclosure bar grounds. *See United States v. Select Med. Corp.*, No. 312CV00051RLYDML, 2017 WL 468276, *4 (S.D. Ind. Feb. 3, 2017) (collecting cases in support of the proposition that, pursuant to the 2010 amendment to § 3730(e)(4)(A), "the government has the right to *block* a defendant's attempt to have a meritorious case dismissed on public disclosure grounds" (emphasis in original)).

The determination of which version of § 3730(e)(4)(A) applies in this case is crucial given that the government has filed a notice "exercising its right to object to the dismissal of Relator Louis Scutellaro's First Amended Complaint on the basis of the Public Disclosure Bar." Notice of U.S. Opp'n to Dismissal on the Basis of the Public Disclosure Bar ("U.S. Opp'n Def.'s MSJ") at 1, ECF No. 106.  The government maintains that the current version of § 3730(e)(4)(A)

controls because this action was filed after the 2010 amendment took effect. *See id.* at 2.[14] The relator argues that the version of § 3730(e)(4)(A) that was in effect at the time of a given underlying sale should apply. *See* Rel.' Opp'n Def.'s MSJ at 5 n.1, ECF No. 111. Although the defendant initially asserted in its motion for summary judgment that the pre-amendment version of the public disclosure bar should control, *see* Def.'s Mem. Supp. MSJ at 1 n.1, ECF No. 92, the defendant appears to have adopted the relator's position in its reply, *see* Def.'s Reply Supp. MSJ at 1, ECF No. 121 ("The pre-amendment version of the Public Disclosure Bar applies to the alleged sales at issue in this case which pre-date the 2010 amendment; and the post-amendment version applies to alleged sales which occur after the amendment.").

The D.C. Circuit has not yet addressed whether the 2010 amendment to § 3730(e)(4)(A) applies retroactively to conduct that occurred prior to the amendment's effective date of March 23, 2010, but the great weight of authority indicates that the 2010 amendment is not retroactive and, therefore, conduct that occurred prior to March 23, 2010, would be subject to the earlier version of the public disclosure bar and later conduct would be subject to the current version. *See United States ex rel. Antoon v. Cleveland Clinic Found.*, 788 F.3d 605, 615 (6th Cir. 2015); *United States ex rel. Zizic v. Q2Administrators*, LLC, 728 F.3d 228, 232 n.3 (3d Cir. 2013); *United States ex rel. May v. Purdue Pharma L.P. ("May")*, 737 F.3d 908, 918 (4th Cir. 2013); *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 934 (7th Cir. 2012); *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 326 n.6 (5th Cir. 2011); *United States ex rel. Poteet v. Bahler Med., Inc.*, 619 F.3d 104, 107 n.2 (1st Cir. 2010); *United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1188 n.3 (8th Cir.

---

[14]  The government states in its notice opposing dismissal on the basis of the public disclosure bar that the government would have intervened as to *all* claims asserted by the relator—thereby rendering the public disclosure bar irrelevant—but was not able to do so due to the defendant's "uncooperative conduct," which "severely interfered with and substantially delayed the United States' investigation." U.S. Opp'n Def.'s MSJ at 2.

2010); *Shea*, 160 F. Supp. 3d at 24 ("[T]he pre-amendment version of § 3730(e)(4)'s public disclosure bar applies to claims arising from Defendants' conduct before March 23, 2010, and the amended version of the public disclosure bar applies to conduct based on post-March 23, 2010 conduct."). This Court agrees with the sound analysis set forth in the foregoing decisions, which are grounded in decisions by the Supreme Court.[15] *See Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 404 n.1 (2011) (suggesting that the 2010 FCA amendments do not apply to cases arising before the effective date of the statute); *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010) ("The legislation makes no mention of retroactivity, which would be necessary for its application to pending cases given that it eliminates petitioners' claimed defense to a *qui tam* suit."). Accordingly, the pre-amendment version of § 3730(e)(4)(A) applies to sales occurring before March 23, 2010, and the post-amendment version of § 3730(e)(4)(A) applies to transactions that post-date the amendment.[16]

---

[15] The sole authority cited by the government in support of its position that the current version of § 3730(e)(4)(A) applies to *all* sales at issue in this case is an unpublished 2012 opinion from another district court. *See United States ex rel. Sanchez v. Abuabara ("Sanchez")*, No. 10-61673-CIV, 2012 WL 1999527, at *2 & n.1 (S.D. Fla. June 4, 2012) ("Since the suit in this case was filed many months after the Act was signed into law, this Court will apply the amended language."). This case predated many of the Court of Appeals decisions that reached an opposite result, and in any event its reasoning is unpersuasive in this case. The court cited two reasons for applying the amended § 3730(e)(4)(A). First, the court noted that in *Schindler*, the Supreme Court "indicated that the amendments to the Patient Protection and Affordable Care Act are not applicable to pending cases" and therefore "applied the language of the statute as it existed when the suit was filed." *Id.* As another Judge on this Court has cogently pointed out, however, "closer inspection of the Supreme Court's precedent on retroactivity reveals that the [Court] use[s] the pendency of a case as shorthand for a more nuanced proposition: Statutes that are not retroactive do not apply to *conduct* occurring before their enactment." *Shea*, 160 F. Supp. 3d at 23. Second, in *Sanchez*, the court indicated that "[t]he parties agree[d] that the amended version of the Public Disclosure Bar is applicable." *Sanchez*, 2012 WL 1999527, at *2 n.1. Although retroactivity questions are typically not left to the parties, especially when there are jurisdictional implications, *see Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (explaining that "consent of the parties is irrelevant" in determining jurisdiction), unlike in *Sanchez*, the parties here do not agree as to which version of the public disclosure bar applies.
[16] The relator's First Amended Complaint alleges: "From 2004 through 2010, Capitol Supply, Inc., maintained numerous GSA Contracts selling goods and services to the United States Government under Schedules 23V; 51V; 56; 70; 71 I; 71 II; 71 II H; 71 II K; 72 II; 73; 75; and, 78. Under these contracts, Capitol Supply, Inc., earned $28,013,169.00 in Fiscal Year 2004; $23,710,802.00 in Fiscal Year 2005; $23,769,619.00 in Fiscal Year 2006; $26,042,464.00 in Fiscal Year 2007; $15,949,093.00 in Fiscal Year 2008; $25,417,389.00 in Fiscal Year

## 1. Pre-Amendment Sales

The defendant argues that the relator's claims based on pre-amendment sales must be dismissed pursuant to the FCA's public disclosure bar. *See generally* Def.'s Mem. Supp. MSJ. The pre-amendment version of § 3730(e)(4)(A) stripped courts of jurisdiction over any FCA action "based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (1986). Thus, even if the information underlying the allegations in an FCA complaint has been publicly disclosed, a relator's claims may proceed if the relator was an original source. Since the applicable version of § 3730(e)(4)(A) is jurisdictional, the relator bears the burden of establishing that the public disclosure bar does not foreclose his claims. *See May*, 811 F.3d at 640; *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 283 (7th Cir.), *cert. denied sub nom. United States ex rel. Cause of Action v. Chicago Transit Auth.*, 137 S. Ct. 205 (2016); *United States ex rel. Purcell v. MWI Corp.*, 824 F. Supp. 2d 12, 21 (D.D.C. 2011) ("The plaintiff bears the burden of establishing jurisdiction under the FCA."), *rev'd and remanded on other grounds*, 807 F.3d 281 (D.C. Cir. 2015).

The public disclosure bar is triggered if either "the *allegation* of fraud itself" *or* "the *transactions* that give rise to an inference of fraud" have been publicly disclosed. *United States ex rel. Oliver v. Philip Morris USA Inc. ("Oliver II")*, 826 F.3d 466, 471 (D.C. Cir. 2016) (emphases added); *see also* 31 U.S.C. § 3730(e)(4)(A) ("No court shall have jurisdiction over an action under this section based upon the public disclosure of *allegations or transactions* . . . ."

2009; and, $12,198,195.00 from October 2009 through March 2010." Rel.'s FAC ¶ 7. Thus, the vast majority of sales at issue occurred before the amendment's effective date.

(emphasis added)). "'Transaction' in this sense 'refers to two or more elements that, when considered together, give rise to an inference that fraud has taken place.'" *Oliver II*, 826 F.3d at 471 (quoting *Oliver I*, 763 F.3d at 40)). The D.C. Circuit has set out a now familiar formula to assess whether a transaction was publicly disclosed: "[I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed." *Springfield Terminal*, 14 F.3d at 654 (emphases in original). Applied to the facts of this case, the transaction would be the fact that the defendant was selling TAA non-compliant products to the government (X), plus the fact that the defendant falsely certified that it was complying with the TAA (Y), which permits the inference that the defendant committed fraud (Z). *Oliver II*, 826 F.3d at 471; *see also Springfield Terminal*, 14 F.3d at 655 ("Fraud requires recognition of two elements: a misrepresented state of facts *and* a true state of facts." (emphasis in original)). If either X and Y, or Z, was in the public domain before the relator brought this action, then the plaintiff's pre–March 23, 2010 claims cannot proceed. *See Oliver II*, 826 F.3d at 471.

The defendant contends that the X, Y, *and* Z elements in this case are each based on publicly disclosed information. As for X—the TAA non-compliant sales—the defendant notes that accurate COO information for the products sold was derived from (1) an online database, ManifestJournals.com, and (2) material collected by the relator's counsel in previous cases, some of which is filed on the public docket. *See* Def.'s Mem. Supp. MSJ at 19, 23. With regard to Y—the false certifications—the defendant points out that the relator relies upon information on the GSA Advantage! website and information obtained by the relator's counsel by way of a Freedom of Information Act ("FOIA") request to the GSA. *See id.* at 21–23. Finally, the

defendant argues that Z—the allegation of fraud itself—was also publicly disclosed in *United States ex rel. Crennen v. Dell Mktg., L.P.*, 711 F. Supp. 2d 157 (D. Mass. 2010), a case in which a relator sued the defendant alleging violations of the FCA predicated on the defendant's false TAA certifications.

As a general matter, the relator argues that the defendant "cannot prevent [the relator's] action simply because some run-of-the-mill information exists in the public domain." Rel.'s Opp'n Def.'s MSJ at 23 (contending that the defendant is seeking to foreclose FCA claims "by scraping together bits and pieces of relevant-but-innocuous information found in the public sphere"); *see also id.* at 24 ("Reams of innocuous information, in a variety of different forums, in the context of a broad transactional field, which would require the Government to painstakingly compile and compare data before discovering fraud" would not "put the Government on notice of fraud."). More specifically, the relator disputes that the information cited by the defendant was publicly available because (1) ManifestJournals.com is not a public channel within the meaning of the FCA because it is a "costly, 'members only' private database," *id.* at 16, (2) the GSA's responses to the relator's counsel's FOIA requests contain only sales information, but no COO information, *id.* at 18, and (3) the defendant cannot rely on discovery from previous cases that was never filed in court to invoke the public disclosure bar, *id.* at 19 ("Whatever (if anything) was disclosed in *Liotine* or *Folliard*, it did not include numerous non-Cisco and non-HP products involved in this action.").

Turning first to the X element of the *Springfield Terminal* equation, the question is whether the fact that the defendant was selling TAA non-compliant products to the government was publicly disclosed. As noted, the defendant argues that both the ManifestJournals.com data, as well as the data that the relator's counsel had collected in previous cases, including data filed

on the public docket, publicly disclosed the accurate COO information for the products defendant sold to the government. *See* Def.'s Mem. Supp. MSJ at 27. The first step is to determine whether either of these sources publicly disclosed the defendant's sale of TAA non-compliant products to the government. If they did, then the question is whether "the public disclosure occur[red] through certain channels specified in the statute." *Oliver II*, 826 F.3d at 474. Ultimately, the Court will not reach the second step of the analysis because, as the relator points out, the defendant has identified nothing in the public domain that disclosed that the defendant was selling Chinese-made products under the GSA contracts to the government.

ManifestJournals.com "is a media company that purchases daily manifest records directly from U.S. Customs under 19 CFR 103.31." Def.'s SMF ¶ 16. The website, which requires a subscription fee, contains a feature called "Super Search Report" that "allow[s] individuals such as [the relator] to search public manifest reports for certain text or phrases, such as 'Fellowes.'" *Id.* ¶ 18. The 554-page Super Search Report obtained by the relator, and attached to his First Amended Complaint, *see* Rel.'s FAC, Ex. 3, Super Search Report, ECF No. 27-3, is a spreadsheet containing seven columns: (1) Bill of Lading Number, (2) Actual Arrival Date, (3) Consignee Name, (4) Shipper Name, (5) Content Description, (6) Marks and Numbers, and (7) Weight.[17] The spreadsheet nowhere mentions the defendant.

---

[17] The defendant contends that the spreadsheet generated by ManifestJournals.com is either "news media" or an "administrative . . . report," relying on *United States ex rel. Doe v. Staples, Inc.*, 932 F. Supp. 2d 34, 40 (D.D.C. 2013), *aff'd*, 773 F.3d 83 (D.C. Cir. 2014), in which another Judge on this Court held that a similar "site qualifies as 'news media.'" *See* Def.'s Mem. Supp. MSJ at 19. The relator, for his part, argues that the website is not a public channel because it is a "costly, 'members' only' private database." Rel.'s Opp'n Def.'s MSJ at 16. The Court need not resolve this dispute whether a subscription service may be a public channel for purposes of the FCA because, as explained below, the chart procured from ManifestJournals.com does not permit a reader to connect the defendant's products to TAA non-compliant countries or otherwise reveal that the defendant was selling TAA non-compliant products. In comparison, in *Staples*, which involved claims that the defendant had misrepresented the origin of imported pencils to the U.S. Customs and Border Protection, the data obtained from a competitor of ManifestJournals.com expressly identified the defendant in that case as the "consignee," *see* Rel.'s First Am. Compl. ¶ 24, Civ. No. 08-846 (RJL), ECF No. 22, and thereby "provide[d] a means to track each shipment to the [Customs entry form] containing the false statement of country of origin," *Staples*, 932 F. Supp. 2d at 40 (internal quotation marks omitted).

Similarly, regarding data used in prior cases, the defendant contends that "the . . . materials used in this litigation were disclosed in numerous cases to [the relator's counsel], and those materials have traveled with him and been used from case-to-case for over ten years." Def.'s Mem Supp. MSJ at 24. Yet, the defendant does not dispute the relator's contention that "the bulk of this information . . . was never filed in court," Rel.'s Opp'n Def.'s MSJ at 3—a prerequisite for public disclosure of discovery materials pursuant to § 3730(e)(4)(A), *see Springfield Terminal*, 14 F.3d at 652 ("[D]iscovery material, when filed with the court (and not subject to protective order), is 'public[ly] disclos[ed]' in a 'civil hearing' for purposes of § 3730(e)(4)(A)'s jurisdictional bar."). Furthermore, what limited data was filed on the public docket—namely, an expert report discussing some COO information in *United States ex rel. Folliard v. Govplace ("Folliard")*, 930 F. Supp. 2d 123, 125 (D.D.C. 2013), *aff'd sub nom. United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19 (D.C. Cir. 2014)—does not refer to the defendant in this case, which makes sense given that the defendant here was not a party in *Folliard*.[18] Thus, there existed in the public domain correct COO information for TAA non-compliant products, but that is not enough to establish X because there is nothing that connects the defendant to those products.[19]

A recent D.C. Circuit opinion underscores the deficiencies in the defendant's reliance on the COO data from ManifestJournals.com and previous cases, including *Folliard*. *See Oliver II*, 826 F. 3d at 472–73. In *Oliver II*, the relator sued Philip Morris under a false certification

---

[18] In *Folliard*, which also involved the TAA, the expert's report sets out COO information for 473 products, *see* Def.'s MSJ, Ex. 10, Albright Report, at 7–24, ECF No. 92-10, some of which are at issue in the instant action, *see generally* Def.'s MSJ, Ex. 17, Table of Overlapping COO Data, ECF No. 92-17.

[19] The relator used sales information his counsel obtained via several FOIA requests to link the defendant to the sales. *See* Def.'s Mem. Supp. MSJ at 21–23. Although an agency response to a FOIA request is itself public, *see Schindler Elevator Corp.*, 563 U.S. at 404, the FOIA request did not contain COO information. The GSA Advantage! website shows only what the defendant listed for sale—not what sales were actually made—and it does not contain accurate COO information in any event.

theory, arguing that the defendant had failed to comply with the Most Favored Customer ("MFC") provision in its contracts with government exchanges that sell goods to customers in the military community. *Id.* at 469. The MFC provision required the defendant to sell its cigarettes at prices equal to or more favorable than other purchasers. *Id.* The defendant moved to dismiss the action on public disclosure bar grounds. *Id.* at 470. The D.C. Circuit defined the X element of the *Springfield Terminal* equation as "the fact that Philip Morris was not providing the Exchanges with the best price for cigarettes." *Id.* at 471 (quoting *Oliver I*, 763 F.3d at 41). To show public disclosure of X, the defendant pointed to a "1999 inter-office memorandum discussing concerns about cigarette pricing at a United States naval station in Iceland." *Id.* at 470. The memorandum at issue "was generated as a result of a letter written by the Director, Morale, Welfare & Recreation (MWR) Department of the U.S. Naval station in Keflavik, Iceland to a duty-free wholesaler in Norfolk, Virginia because the MWR facility . . . tried, unsuccessfully, to have a duty-free wholesaler . . . supply them with Philip Morris products." *Id.* at 472–73 (internal quotation marks omitted). The same memorandum had been produced in earlier litigation and was "publicly accessible via the internet," "pursuant to a settlement agreement that required Philip Morris to [publish in an online database] documents that were produced in litigation." *Id.* at 475. As the D.C. Circuit put it, the memorandum undisputedly "reflect[ed] a differential between the prices charged to the military and to private parties," *id.* at 472 (internal quotation marks omitted), and thus, the memorandum established that X had been publicly disclosed, *id.* at 473. Unlike the memorandum, which established in a single document that the defendant seller had been violating its contract, here, no single public disclosure

evidences that the defendant was selling Chinese-made products to the government.[20] The defendant has cited no caselaw to suggest that it would be proper for the Court to piece together a public disclosure of X from multiple disparate sources.

Given that X has not been publicly disclosed, consideration of whether Y has been publicly disclosed is unnecessary, since both parts of the equation must be disclosed to trigger the public disclosure bar. As noted above, however, the public disclosure bar may also kick in where Z has been publicly disclosed.

Turning to the Z element of the *Springfield Terminal* formula, the defendant argues that a previous case, *United States ex rel. Crennen v. Dell Marketing, L.P. ("Crennen")*, 711 F. Supp. 2d 157 (D. Mass. 2010), publicly disclosed the allegations of the defendant's fraud. *See* Def.'s Mem. Supp. MSJ at 27. In particular, the defendant maintains that "*Crennen* . . . satisfies the 'Z' element (the allegation of fraud) because the *same* allegations—that Capitol allegedly fraudulently misrepresented the COO of products—regarding the *same* GSA contract and brands of products in *Crennen* now appear in this case." Def.'s Reply Supp. MSJ at 13 (emphases in original). The relator notes none of the products at issue in *Crennen* is at issue in this case, Rel.'s Opp'n Def.'s MSJ at 22, and contends that "the passage of time has rendered the information in *Crennen* stale," *id.* at 27 (citing *United States ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 353 (S.D.N.Y. 2014) ("[T]he fact of the state court lawsuits had become sufficiently stale so that Caremark secured a 'clean slate,' as it were, for purposes of the

---

[20] The notices sent to the defendant from the New York GSA office are distinguishable from the inter-office memorandum at issue in *Oliver II*. First, the defendant has not argued that the notices were published pursuant to a statutorily delineated public channel. Unlike the memorandum in *Oliver II*, which was published pursuant to a settlement agreement and therefore "publicly disclosed in a civil hearing," *Oliver II*, 826 F.3d at 475, the notices here were merely sent to the defendant. Second, whereas the memorandum plainly discussed a price differential, *i.e.*, information that directly established the X element, the notices here refer merely to the defendant's *listing* of TAA non-compliant products—not *sales* of those products. *See United States ex rel. Folliard v. Govplace*, 930 F. Supp. 2d 123, 127 (D.D.C. 2013) (noting that relators "may only pursue claims connected to sales, not simply listings of items for sale").

public disclosure bar; the old accusations against Caremark could no longer be deemed 'substantially similar' to any allegations of current misconduct, even if the allegations were similar in every other way.")).

Although a close question given that *Crennen* involved FCA claims against the same defendant as in the instant case predicated on sales of TAA non-compliant products to the government, the Court cannot conclude that the instant action is "based upon" the allegations in *Crennen*. In conducting this analysis, the driving question is "whether the publicly disclosed information could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing." *United States ex rel. Settlemire v. District of Columbia ("Settlemire")*, 198 F.3d 913, 918 (D.C. Cir. 1999) (internal quotation marks omitted). *Crennen* would not have led law enforcement authorities to investigate the alleged fraud at issue in this case because the allegations in *Crennen*, leveled at 10 different defendants, were exceedingly vague. Indeed, the complaint was dismissed under Federal Rule of Civil Procedure 9(b) because, *inter alia*, "after three years and a government investigation, [the relator] still [could not] allege that any specific claim was planned or submitted for a product listed on the GSA Advantage! website with a false country of origin." *Crennen*, 711 F. Supp. 2d at 164. In essence, the relator in *Crennen* alleged merely that he had visited government buildings and observed products that originated in non-designated countries, and that the same products were posted on the GSA Advantage! website. *Id.* at 159–60. The court dismissed the complaint as patently insufficient because the relator had failed to allege that "any of the defendants sold to the Government any technology that came from a non-designated country; nor [was] there any allegation that the federal agencies acquired those specific products though the GSA Advantage! website." *Id.* at 162. Put differently, the complaint in *Crennen* did

not allege a fraud. That being the case, a hypothetical government investigator could not have been meaningfully alerted to alleged fraud by the defendant in this case.[21] *See Settlemire*, 198 F.3d at 918; *see also Dingle v. Bioport Corp.*, 388 F.3d 209, 215 (6th Cir. 2004) (explaining that "general and unsupported allegations of fraud will often not be enough to bar a *qui tam* action" but ultimately concluding that, "[i]n this case, . . . the allegations and transactions discussed in the public disclosures are sufficiently definite to give the government enough information about possible fraud as they specifically mention the manufacturing process as well as the filters themselves"). The defendant's argument that *Crennen* triggers the public disclosure bar in this case is untenable. The defendant is not entitled to immunity from liability under the FCA in perpetuity any time a relator alleges any form of fraud, no matter how deficient the allegations are.

## 2. Post-Amendment Sales

The pre-amendment analysis of the public disclosure bar applies equally to post-amendment sales. Nonetheless, as noted above, the 2010 amendment to the FCA affords the government the ability to block dismissal on public disclosure bar grounds. Accordingly, the government's objection to application of the public disclosure bar, *see generally* U.S. Opp'n Def.'s MSJ, forecloses dismissal of the relator's claims predicated on those sales that occurred on or after March 23, 2010. *See United States ex rel. Szymoniak v. Am. Home Mortg. Servicing, Inc.*, No. 0:10-CV-01465-JFA, 2014 WL 1910845, at *1 (D.S.C. May 12, 2014) ("The relevant amendment took effect on March 23, 2010, and under the amended statute, the United States

---

[21]   Moreover, the relator in *Crennen* attached to his complaint a list of products that had allegedly been listed as made in TAA-designated countries on the GSA Advantage! website but that were in fact marked on the product or package as being made in a non-designated country. Def.'s MSJ, Ex. 20, *Crennen* Amended Complaint ¶ 36, ECF No. 92-20; *id.*, Ex. A. The attachment referenced only six products allegedly listed by the defendant in the instant case: a monitor, a mouse, and four printers. *Id.*, Ex. A at 1. This list of six products simply does not capture the breadth of products and manufacturers at issue in the instant case.

may oppose the dismissal of a complaint pursuant to the public disclosure bar."), *aff'd sub nom.*
*United States ex rel. Szymoniak v. Am. Home Mortg. Servicing, Inc.*, No. 15-1720, 2017 WL
634705 (4th Cir. Feb. 16, 2017); *Select Med. Corp.*, 2017 WL 468276, at *4; *United States v.*
*Prime Healthcare Servs., Inc.*, No. 11-CV-8214 PJW, 2014 WL 12480026, at *2–3 (C.D. Cal.
Nov. 20, 2014). Accordingly, the defendant's motion for summary judgment is denied with
respect to the relator's claims involving sales that occurred on or after March 23, 2010.[22]

### C. The Relator's and Government's Motions for Summary Judgment

Having concluded that the public disclosure bar does not foreclose the relator's claims,
the Court turns next to the relator's and government's motions for summary judgment.

### 1. Liability

The FCA provides for civil liability for anyone who "knowingly presents, or causes to be
presented . . . a false or fraudulent claim for payment or approval" or who "knowingly makes,
uses, or causes to be made or used, a false record or statement material to a false or fraudulent
claim." 31 U.S.C. § 3729(a)(1)–(2). An FCA claim contains three elements: (1) the "defendant
submitted a claim to the government," (2) "the claim was false," and (3) "the defendant knew the
claim was false." *United States v. Dynamic Visions, Inc.*, Civil No. 11-695 (CKK), 2016 WL
6208349, at *8 (D.D.C. Oct. 24, 2016) (quoting *United States v. Toyobo Co.*, 811 F. Supp. 2d 37,
45 (D.D.C. 2011) (quoting *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 6 (D.D.C.
2003))). Since the defendant does not dispute that there are no genuine issues of material fact as
to whether the defendant submitted claims for payment to the government, *see generally* Def.'s

---

[22]      The relator argues, in the alternative, that he was an "original source" of the information underlying his
allegations. *See* Rel.'s Opp'n Def.'s MSJ at 27–29. The defendant contends that the relator does not qualify as an
original source. *See* Def.'s Reply Supp. MSJ at 18–23. Given that the relator's allegations are not based on publicly
disclosed information, as explained above, the Court will not "proceed to the 'original source' inquiry." *Springfield
Terminal*, 14 F.3d at 651.

Opp'n U.S. & Rel.'s MSJs, the parties' arguments as to the latter two elements are addressed *seriatim*.

### a. Falsity and Materiality

"In the paradigmatic case, a claim is false because it 'involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'" *United States v. Sci. Applications Intern. Corp. ("SAIC")*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)). Alternatively, however, "a plaintiff may proceed under the so-called 'certification' theory of liability," under which "the falsity of a claim for payment rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *United States ex rel. McBride v. Halliburton Co. ("McBride")*, 848 F.3d 1027, 1031 (D.C. Cir. 2017) (internal quotation marks and citations omitted). "False certifications can be either express or implied." *SAIC*, 626 F.3d at 1266. "An expressly false claim is, as the term suggests, a claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." *Mikes*, 274 F.3d at 698; *see also United States v. Speqtrum, Inc. ("Speqtrum I")*, 47 F. Supp. 3d 81, 91 (D.D.C. 2014) (explaining that a false certification is "express" when "the bills or invoices submitted . . . contain[] explicit statements that [the defendant] was in compliance with all the relevant regulations"). An "implied false certification," relied upon by plaintiffs in this case, occurs "[w]hen . . . a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements." *Universal Health Servs., Inc. v. United States ("Escobar")*, 136 S. Ct. 1989, 1999 (2016); *see also United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 154 (D.D.C. 2011) (explaining that an implied false certification "occurs when the claimant makes no affirmative representation

but fails to comply with a contractual or regulatory provision where certification was a prerequisite to the government action sought" (internal quotation marks omitted)).

With respect to implied false certification claims, the D.C. Circuit has explained that the underlying claim for payment at issue need not include "express contractual language specifically linking compliance to eligibility for payment." *SAIC*, 626 F.3d at 1269. Instead, the government merely needs to show "that the contractor withheld information about its noncompliance with material contractual requirements."[23] *Id.* Both the Supreme Court and the D.C. Circuit, however, have instructed that "courts should continue to police expansive implied certification theories 'through strict enforcement of the Act's materiality and scienter requirements.'" *McBride*, 848 F.3d at 1031–32 (quoting *Escobar*, 136 S. Ct. at 2002 (quoting *SAIC*, 626 F.3d at 1270)). Thus, for purposes of falsity, it is not enough that the defendant's products failed to comply with the TAA—as can be established, *inter alia*, by the adverse inferences against the defendant. To be entitled to summary judgment, the plaintiffs must also show that there is no genuine issue of material fact as to whether that TAA compliance was material to the government's decision to pay.[24]

---

[23]  *Escobar*, decided after the conclusion of briefing in this case, both endorsed and clarified the "implied false certification" theory of liability, and limited its holding to cases where two criteria are met: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001. In its decision, however, the Supreme Court expressly left open the question whether a claim that "merely demand[s] payment," as opposed to one that makes specific representations about goods or services provided, is sufficient to provide a basis for an implied false certification claim. *Id.* at 2000. Since the Supreme Court did not expressly overrule this theory of liability, the standard set forth in *SAIC* still governs in this Circuit. *See United States ex rel. Landis v. Tailwind Sports Corp.*, Civil No. 10-976 (CRC), 2017 WL 573470, at *11 (D.D.C. Feb. 13, 2017) (following *SAIC* in light of the Supreme Court's silence on the issue) (citing *United States v. Dynamic Visions, Inc.*, 2016 WL 6208349, at *9). In February 2017, after the D.C. Circuit decided *McBride*, this Court ordered the parties to submit supplemental briefing on the question of how *Escobar* and *McBride* affect the instant case. *See* Minute Order (dated Feb. 28, 2017). Each party submitted a brief arguing that the decisions support a finding of summary judgment in its favor. *See* U.S. Supp. Br. at 2, ECF No. 134; Rel.'s Supp. Br. at 2, ECF No. 136; Def.'s Supp. Br. at 21, ECF. No. 135.

[24]  The government notes that the defendant admits in its Statement of Genuine Issues of Material Fact that it "possessed information that demonstrated a compliant COO for approximately 348 of the 588 transactions

41

The FCA defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Escobar*, 136 S. Ct. at 2002 (quoting 31 U.S.C. § 3729(b)(4)). Since the materiality requirement of the FCA is derived from "common-law antecedents," *id.* (quoting *Kungys v. United States*, 485 U.S. 759, 769 (1988)), the Supreme Court has instructed that, under both the FCA and the common law, "materiality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," *id.* at 2002–03 (quoting 26 R. LORD, WILLISTON ON CONTRACTS § 69:12, p. 549 (4th ed. 2003)). This "materiality standard is demanding," as the FCA is not "'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 2003 (quoting *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)). The Supreme Court has made clear that materiality "cannot be found where noncompliance is minor or insubstantial." *Escobar*, 136 S. Ct. at 2003. "Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.*

In *Escobar*, the Supreme Court set forth a number of factors that may be taken into account in determining materiality. First, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* Second, "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" supports a finding that the requirement is material. *Id.* Third, and "[c]onversely, if the Government pays a particular claim in full despite its actual knowledge that

---

identified" by the government as "allegedly involving noncompliant products." Def.'s SMF ¶ 110. Thus, the defendant may also have effectively conceded that it sold at least 240 products it could not have certified as TAA compliant.

certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* Fourth, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* In sum, "*Escobar* makes clear that courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive." *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016). As the Supreme Court explained, "materiality cannot rest 'on a single fact or occurrence as always determinative.'" *Escobar*, 136 S. Ct. at 2001 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)).

The government offers four arguments as to why the statutory, regulatory, and contractual requirements regarding TAA compliance are material in this case: (1) the requirements were conditions of payment because the TAA and its implementing regulations, incorporated into the defendant's contracts, prohibit the sale of and payment for any products manufactured in non-designated countries; (2) the violations were "significant" and not "minor or insubstantial" because the defendant had to certify in the contract that its end products were not manufactured in a non-designated country; (3) GSA's notices to the defendant of non-compliance, and its warnings that DOJ had reached settlements under the "qui tam provision of the False Claims Act" in other cases, show that the defendant had knowledge of the government's "treatment of past, known violations;" and (4) at one point, the GSA reacted to the plaintiff's non-compliance by issuing a Cure Notification Letter that imposed sanctions on the defendant, including suspension and nonpayment. U.S. Supp. Br. at 17–18.

The defendant does not substantively respond to the plaintiffs' arguments regarding the materiality of TAA compliance.[25] Instead, the defendant's primary argument is that when the government purchases its products, the COO would have been "marked in a conspicuous place" on the product or its packaging, thereby giving the government a clear indication of the products' accurate COO information.[26] Def.'s Supp. Br. at 6 (citing 19 C.F.R. § 134.11 (requiring "that every article of foreign origin (or its container) imported into the United States shall be marked in a conspicuous place . . . to indicate to an ultimate purchaser . . . the country of origin")).[27] Other than this citation to a regulation for the U.S. Customs and Border Protection, the defendant provides no evidence that the government would have, in fact, been aware of the COO of each of the defendant's products. *See* FED. R. CIV. P. 56(c) (explaining that, for purposes of summary judgment, a non-movant must support an assertion with evidence in a form that would be admissible).[28]

---

[25]     In its brief opposing the plaintiffs' motions for summary judgment, the defendant disputes whether the TAA requirements were "conditions of payment," asserting that they are instead "conditions of participation." Def.'s Opp'n at 5–6. In *Escobar*, the Supreme Court held that FCA liability "for failing to disclose violations of legal requirements does not turn upon whether those requirements were expressly designated as conditions of payment." *Escobar*, 136 S. Ct. at 1996. "What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Id.* In so holding, the Supreme Court affirmed the law in the D.C. Circuit, which had already rejected the distinction between "conditions of payment" and "conditions of participation." *See SAIC*, 626 F.3d at 1266–68.

[26]     The government argues that the defendant improperly raises arguments in its supplemental brief that were not raised in its original summary judgment motion. *See* U.S. Reply Def.'s Supp. Br. at 2, ECF No. 137. Although the government is correct about the defendant's belated arguments raised for the first time in its supplemental brief, the merits of those arguments are nonetheless considered. The issues raised by the defendant in its supplemental brief present serious questions about whether the government has satisfied the materiality standard, and courts favor resolution of issues on the merits. The plaintiffs have had an opportunity to address these arguments fully in their reply briefs. *See Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 308 F.R.D. 27, 32 (D.D.C. 2015); *see also In re Apollo Grp., Inc. Sec. Litig.*, No. MISC.A. 06-558 (CKK), 2007 WL 778653, at *5 (D.D.C. Mar. 12, 2007). Moreover, courts often entertain new arguments "resulting in part from 'an intervening change in the law.'" *Wang by & through Wong v. New Mighty U.S. Trust*, 843 F.3d 487, 493 (D.C. Cir. 2016) (quoting *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992)). Here, *Escobar* clarified the types of evidence that support the materiality inquiry in the FCA context, warranting consideration of the defendant's new arguments raised in its supplemental brief.

[27]     The defendant incorrectly cites "13 C.F.R. § 134.11," which does not exist.

[28]     The defendant also argues that the TAA clause at issue is not material because the "bulk of the products at issue in this case fall below the current 'Micro-Purchase Threshold' of $3,500 and previous 'Micro-Purchase

That said, while materiality is not always "too fact intensive" to resolve on summary judgment, *Escobar*, 136 S. Ct. at 2004 n.6, the standard is both "rigorous" and "demanding," *id.* at 2002–03. As the Supreme Court made clear in *Escobar*, it is "very strong evidence" that requirements are immaterial if the government "pays a particular claim in full despite its actual knowledge that [those] requirements were violated." *Id.* at 2003. Moreover, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* Here, it is possible that the government did both.

Indeed, for more than a decade, the GSA gave the defendant mixed signals. On the one hand, the GSA's regional office gave the defendant not just "satisfactory" or "very good," but "*exceptional*" ratings on its report cards. *See* GSA PowerPoint at 16; *see also generally* GSA Report Cards. Ms. Springer, the assigned IOA out of the Atlanta Regional Office who conducted the defendant's CAVs, never *once* marked the defendant down for TAA non-compliance despite the defendant's complete lack of retention of historical COO information until at least June 2009, testifying that she "didn't see anything wrong with their process or their understanding of the Trade Agreements Act." Springer Dep. I at 67:2–6. Moreover, during the pendency of this

---

Threshold' of $3,000, in FAR 2.101." Def.'s Supp. Br. at 16. The defendant notes that the Buy American Act ("BAA"), 41 U.S.C. § 83, "establishes a preference for goods manufactured in the United States where the purchase order . . . for such goods exceeds the micro-purchase threshold." *Id.* As the government argues, however, the defendant fails to provide any authority demonstrating that the "micro-purchase threshold" of the BAA applies in this case. U.S. Supp. Reply. at 3, ECF No. 137. The TAA is an exception to the BAA, and the government notes that the contract at issue in this case specifically excludes the BAA from its coverage, *id.* (citing MAS Contract 0100N at 70 (noting that the BAA is not applicable), while incorporating the TAA requirement that the defendant was required to certify that "each end product" offered for sale under the contract is TAA compliant, unless otherwise specified by the contractor. *See* MAS Contract 0100N at 84-85. Indeed, Robert Steinman, the defendant's CEO, was specifically asked about the micro-purchase threshold and, in his response, stated that the defendant conducts its business as if "all items we sold had to be TAA compliant." Steinman Dep. at 42. Finally, in support of this argument, the defendant attached to its supplemental briefing a letter from the Federal Aviation Administration ("FAA"). *See* Def.'s Supp. Br., Ex. 1, ECF No. 135-1. This letter, which was not provided in discovery, *see* FED. R. CIV. P. 26(e)), addresses a separate statute, the Buy American Act for Aviation Programs, 49 U.S.C. § 50101, which is not implicated in this case. Thus, the defendant's argument that the micro-purchase threshold of the BAA has any relevance to the materiality inquiry is not persuasive.

seven-year litigation, the defendant received two additional GSA contracts and seven renewals of prior contracts. Def.'s SMF ¶ 11.

At the same time, however, GSA employees in New York were sending the defendant regular notices for contract breaches, citing the defendant's listing of TAA non-compliant products for sale on agency websites. Between 2005 and 2012, while the defendant was receiving stellar marks on its report cards from GSA's regional office, GSA's New York office sent the defendant at least seventeen notices for non-compliance with the TAA. *See* U.S. MSJ, Exs. 4A–4Q. These notices stressed that "compliance with the [TAA] is a serious issue" and expressly warned the defendant that the government had brought FCA actions against other contractors for violations of the TAA. *See id.* The defendant's "continued contract violations" ultimately led to a Cure Notification Letter declaring the defendant's "current level of performance [as] unacceptable," due to, in part, violations of FAR § 52.225-5. *See* U.S. MSJ, Ex. 5, GSA Cure Notification Letter, at 1, 3, ECF No. 94-8. The Cure Notification Letter prompted GSA to pull the defendant's pricelist catalog down from the GSA Advantage! website and suspend all payments to the defendant for at least one week. *Id.* at 1.

Thus, while a regional GSA employee seemed either entirely unaware of, or nonplussed by, the defendant's TAA non-compliance, other GSA personnel expressed deep concern, and GSA continued to extend contract renewals and new contracts to the defendant. Whether these mixed signals are due to ignorance, incompetence, political pressure, or worse, on the part of GSA employees, ineffective communications within GSA, or discounting of concerns over the defendant's TAA non-compliance, are determinations that will rest on credibility assessments and are consequently appropriately left to the jury. Given GSA's mixed signals, issues of material fact remain as to whether the impliedly false certifications were material, *i.e.*, whether

TAA compliance had the "natural tendency to influence . . . the payment or receipt of money or property." *Escobar*, 136 S. Ct. at 2002 (citation omitted). Accordingly, none of the parties is entitled to summary judgment on the element of "falsity."

### b. Scienter

The second element of an FCA claim is *scienter*. The FCA's *scienter* requirement attaches liability to one who "knowingly presents . . . a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). To establish the *scienter* element of an implied certification claim, the defendant must have known both "(1) that it violated a contractual obligation or regulation, and (2) that its compliance with that obligation was material to the government's decision to pay." *SAIC*, 626 F.3d at 1269. The FCA defines "knowingly" to mean "actual knowledge," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A); *see also SAIC*, 626 F.3d at 1266. "Actual knowledge looks at 'subjective knowledge,' while deliberate ignorance 'seeks out the kind of willful blindness from which subjective intent can be inferred.'" *United States v. Speqtrum, Inc. ("Speqtrum II")*, 113 F. Supp. 3d 238, 249 (D.D.C. 2015) (quoting *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 57 (D.D.C. 2007)). Reckless disregard, in contrast, is "an extension of gross negligence . . . an extreme version of ordinary negligence," *Krizek*, 111 F.3d at 942, "or 'gross negligence-plus,'" *id.* at 943; *see also United States ex rel. K & R Ltd. P'ship v. Massachusetts Hous. Fin. Agency,* 530 F.3d 980, 983 (D.C. Cir. 2008); *United States ex rel. Bettis v. Odebrecht Contractors of California, Inc.*, 297 F. Supp. 2d 272, 277 (D.D.C. 2004), *aff'd,* 393 F.3d 1321 (D.C. Cir. 2005) ("innocent mistakes" or "negligence . . . are insufficient;"

"the claim must be a lie").  The reckless disregard standard "address[es] the refusal to learn of information which an individual, in the exercise of prudent judgment, should have discovered." *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.*, 370 F. Supp. 2d 18, 42 (D.D.C. 2005).

The relator first argues that the defendant had "actual knowledge" that it was submitting false claims to the government because the relator's expert found that between 6,231 and 8,335 TAA non-compliant goods were sold based solely on analysis of the *defendant's* own records. Rel.'s Mem. Supp. MSJ at 18 (citing Steward Decl. ¶¶ 20–28).[29]  Thus, the relator contends that the defendant had "received information indicating that these products originated from non-designated countries, recorded this information in its own records, and then simply proceeded to sell the products anyway with evidence of the products' TAA-non-compliance plainly in its possession."  *Id.*  This argument faces two hurdles.  First, as discussed *infra*, the defendant disputes the relator's expert's analysis, and genuine issues of material fact remain as to just how many TAA-non-compliant products the defendant actually sold.  Second, even assuming the relator's expert's analysis is correct, the mere fact that the defendant's records show, in hindsight, that the defendant sold TAA non-compliant products does not conclusively establish that the defendant had actual knowledge that a given product was non-compliant when it submitted the relevant claim for payment.  Thus, while the defendant's records of non-compliance may serve as evidence of actual knowledge, genuine issues of material fact remain such that plaintiffs are not entitled to summary judgment.

---

[29]  The relator also points out that the defendant must have actually known that TAA compliance was a contractual requirement because the defendant's primary source of business had been the federal government since 1996, and the defendant's president had attended numerous GSA meetings concerning regulatory requirements and indeed "admitted familiarity" with the term "designated country."  Rel.'s Mem. Supp. MSJ at 18.

The government also argues that one of the defendant's suppliers, United Stationers, put the defendant "on notice that it was selling Chinese made shredders to the government." U.S. Mem. at 11. Specifically, the government contends that its expert established that United Stationers' COO data showed that Fellowes shredders sold through the defendant's purchasing channels were Chinese-made. *Id.* The defendant responds that United Stationers did not "transmit [COO information] on the invoice level," and instead the defendant obtained the information only on a quarterly basis. Def.'s Mem. at 32 (quoting Dep. of Nilesh Patel ("Patel Dep.") at 37:7–9; 49:7–13, ECF No. 100. Thus, genuine issues of material fact remain as to whether the defendant was sufficiently put on notice by United Stationers that it was selling Chinese-made shredders at the time it submitted the relevant claims for payment.

The relator relies heavily on the notices the defendant received from GSA informing the defendant that it was listing TAA non-compliant products for sale on agency websites. *See* Rel.'s Mem. Supp. MSJ at 18–19. While the notices may establish that the defendant knew it was *listing* TAA non-compliant products for sale, the notices do not necessarily show that the defendant knew it had *sold* any TAA non-compliant product when it submitted the relevant claim for payment. *See United States ex rel. Folliard v. Govplace*, 930 F. Supp.2d 123, 127 (D.D.C. 2013) (explaining that a relator "may only pursue claims connected to sales, not simply listings of items for sale"). As noted *supra*, moreover, at the same time the government was sending the defendant notices instructing the defendant to remove TAA non-compliant products from the GSA Advantage! website, the defendant was also receiving high marks on its report cards following each of its CAVs. *Cf. United States ex rel. Folliard v. Gov't Acquisitions*, 764 F.3d at 30 (concluding that reliance on a suppliers' certifications of COO data was reasonable in part because the defendant had notified GSA of its reliance during CAVs and GSA's report cards

evaluating the defendant "all concluded that [the defendant] ha[d] complied with the TAA"). Thus, any inference of knowledge based on the GSA notices will necessarily depend on weighing evidence and credibility determinations of witnesses, and thus cannot be the basis for summary judgment against the defendant. *See Reeves*, 530 U.S. at 150; *Burley*, 801 F.3d at 295– 96.

The relator also argues that the defendant acted with deliberate ignorance and reckless disregard because it "maintained no written protocol for collecting and utilizing COO data," Rel.'s Mem. Supp. MSJ at 22, and "reli[ance] on vendor supplied COO information was unreasonable," *Id.* at 20.[30] The relator cites *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19 (D.C. Cir. 2014), for the proposition that "[r]eliance on information from a third-party for regulatory compliance support is only reasonable when such third party specifically guarantees compliance." Rel.'s Mem. Supp. MSJ at 20–21. *Folliard*, however, merely held that a defendant had "reasonably relied on Ingram Micro's COO certification" on the specific facts of the case because Ingram Micro specifically certified its products' COO. *Folliard*, 764 F.3d at 30–31. In this case, none of the defendant's suppliers expressly certified that its products were TAA compliant. *See, e.g.*, U.S. Mot., Ex. 6, United Stationers' Letter of Supply, ECF No. 94-9, Ex. 8, Tech Data Terms & Conditions of Sale, ECF No. 94-11, Ex. 7, Ingram Micro Letter of Supply and accompanying Fellowes Letter of Supply ("Ingram Micro Letter of Supply"), ECF No. 94-10. This does not, however, render any reliance on its suppliers' representations automatically unreasonable. Especially given the heightened standard of reckless disregard under the FCA, a jury must determine whether any reliance on supplier information was not just unreasonable but was "gross negligence-plus." *Krizek*, 111 F.3d at 943.

---

[30] The relator suggests that the defendant had a "non-delegable duty to furnish only TAA-compliant products to government customers," Rel.'s Mem. Supp. MSJ at 20, but cites no authority in support of this proposition.

In sum, although the plaintiffs have produced evidence that might support a finding of *scienter*, any such conclusion would entail weighing competing evidence and credibility assessments of witnesses. Accordingly, no party is entitled to summary judgment on the issue of *scienter*.

### 2.    Damages

The FCA imposes two types of damages: civil penalties ranging between $5,500 and $11,000 for each false claim submitted to the government, and, on top of that, actual damages calculated at three times the amount of any monetary loss the government suffered because of the false claims. 31 U.S.C. § 3729(a)(1)(G); 28 C.F.R. § 85.3(a)(9) (adjusting penalties for inflation). "To establish damages, the government must show not only that the defendant's false claims caused the government to make payments that it would have otherwise withheld, but also that the performance the government received was worth less than what it believed it had purchased." *SAIC*, 626 F.3d at 1279.

As noted above, in calculating the number and value of the defendant's TAA non-compliant sales to the government, the relator's expert arrived at four alternative figures. Rel.'s SMF ¶ 41. Based on these differing numbers, the expert determined that "damages against [the defendant] currently amount to between $4,223,734 and $4,834,716 over 21,860 to 24,8080 invoices." Rel.'s Mem. Supp. MSJ at 29. The relator "believes" "that the higher of each of these" numbers "is appropriate for summary judgment." *Id*. Furthermore, according to the relator, "[g]iven the extent of unlawful behavior, and the extent of missing or destroyed documentation, . . . treble damages are appropriate." *Id*. The relator's "belie[f]" that the defendant submitted 24,808 invoices with TAA non-compliant products, as opposed to 21,860 invoices, is not sufficient basis to find, on summary judgment, that the higher of these two

numbers is appropriate. The very fact that the relator's own expert could not come to a precise conclusion only illustrates that there is a genuine dispute as to how many non-compliant products were actually sold by the defendant.[31]

Further, the defendant calls into question the abilities and methodologies of plaintiffs' experts, criticizing the government's expert report as being "riddled with errors" and "based in part on speculation and conjecture," and for "exclud[ing] exculpatory information . . . [to] fit Plaintiffs [sic] theory of the case." Def.'s Opp'n U.S. & Rel.'s MSJs at 13–15. The defendant also notes that the government's expert, Mr. Kozlow, was not able to match the vendor for all of the sales identified in his report and yet, "[e]ven if [Kozlow] could not confirm the vendor for a particular sale, he still included such sales in his totals for items allegedly coming from non-designated countries." *Id.* at 13. Furthermore, the defendant asserts that Mr. Kozlow did not review or "chose to disregard" two files and an email from a vendor, including a file that "contains a historical catalog of all COO information for every product sold by Capitol since approximately 2010." *Id.* at 15. According to the defendant, it matched COO information against the list of "allegedly non-complaint shredders attached to the United States' Complaint" and by "utilizing the files" the defendant alleges Mr. Kozlow did not use, "Capitol has demonstrated that it possessed compliant COO information for approximately 348 of the 588 transactions . . . identified in Mr. Kozlow's Report as allegedly involving non-compliant products." *Id.* at 16.

The defendant argues that the relator's expert's report "suffers from similar fatal flaws." *Id.* at 16 (questioning the relator's expert's experience and qualifications). In particular, the

---

[31] While the Court will permit the jury to draw an adverse inference given the incomplete data available in this case, the scope of that inference in terms of the number of non-compliant products sold will be determined by the jury's evaluation of the evidence.

defendant contends that the relator's expert, Dr. Steward, overstated the certainty of whether data he gathered and analyzed in fact pointed to the level of TAA non-compliance the plaintiffs' used to calculated the amount of their claim. *See id*. at 18–19. The abilities and methodologies of plaintiffs' experts will surely be material to a damages determination if liability is found, providing yet another basis for denying summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the relator's and the government's motions for adverse inference are granted. The form that the adverse inference will take at trial must be addressed in forthcoming pre-trial motions *in limine*. The defendant's motion for summary judgment is denied because the public disclosure bar is inapplicable in this case. The plaintiffs' motions for summary judgment are denied because genuine issues of material fact remain as to falsity, scienter, and damages.

An Order reflecting the holdings of this Memorandum Opinion was entered on March 31, 2017. *See* ECF No. 140.

Date: April 19, 2017

                                  _____
                                  BERYL A. HOWELL
                                  Chief Judge